2016 IL App (1st) 151196

FOURTH DIVISION
September 8, 2016

No. 1-15-1196

| | | |
|---|---|---|
| ILLINOIS EMCASCO INSURANCE COMPANY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 14 CH 4901 |
| | ) | |
| ERIN TUFANO, EARLE TUFANO, and | ) | |
| MARY S. TUFANO, | ) | Honorable |
| | ) | LeRoy K. Martin |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Erin Tufano (Tufano) was a passenger in a car that collided with another car.

As a result, she suffered significant, permanent injuries that she valued in the millions of dollars.

She sued both drivers. One driver had a $100,000 insurance policy that was tendered in full to

Tufano. The other driver had a $300,000 insurance policy that likewise was tendered (resulting

in a payment of $295,000). Tufano also had underinsured-motorist coverage of her own in the

amount of $500,000 with plaintiff Illinois Emcasco Insurance Company (Emcasco).

¶ 2    In this declaratory-judgment action, Emcasco says that it is only required to cover the

difference between what Tufano received from the two drivers collectively ($395,000) and what

she contracted for with Emcasco ($500,000), so that Emcasco only owes her $105,000 in

underinsurance coverage. Tufano, on the other hand, says that she should be able to apply the

$500,000 underinsurance coverage as to each driver separately, such that she would receive

$400,000 in underinsurance coverage for the first driver (who was only insured for $100,000)

and $205,000 in underinsurance coverage from the second driver (who paid $295,000), for a total of $605,000 from Emcasco.

¶ 3    Emcasco moved for judgment on the pleadings, and Tufano moved for summary judgment. The circuit court agreed with Emcasco and entered judgment in its favor.

¶ 4    Based on long-settled case law, we disagree with the ruling of the circuit court, which adopted Emcasco's position. Emcasco may not *collectively* offset the sum total paid by the two drivers ($395,000) from its $500,000 underinsured-motorist policy and claim that it only owes Tufano $105,000. Rather, we agree with Tufano that each instance of underinsurance must be considered *individually*. Viewed in that way, Tufano would ordinarily be entitled to receive $400,000 in underinsurance coverage for the first driver (who was only insured for $100,000) and $205,000 in underinsurance coverage for the second driver (who paid $295,000), for a total of $605,000. But Tufano's underinsurance policy with Emscasco was only for $500,000, and she cannot receive more than the $500,000 for which she contracted, and on which the policy premiums were based. Thus, we disagree with Tufano that she is entitled to $605,000; at most, she could receive $500,000 from Emcasco for the underinsurance of the two drivers.

¶ 5    We vacate the trial court's ruling and remand for further proceedings. On remand, the court shall enter summary judgment in favor of Tufano on the question of liability. On the question of damages, Tufano is entitled to no more than $500,000 from Emcasco. But because Tufano's actual damages from the car accident have not been determined as a matter of fact or stipulation, and to prevent Tufano from obtaining a double recovery, the trial court must conduct a hearing to determine the extent of Tufano's damages and whether they exceed what the two drivers have already paid her, and to the extent they do, she will be entitled to recovery from Emcasco up to $500,000.

¶ 6                                    I. BACKGROUND

¶ 7      The relevant facts are not in dispute. On July 2, 2013, two vehicles were involved in a collision in McHenry Township. One vehicle was being driven by Margaret Zienkiewicz and the other by Nicole M. Mann. Erin Tufano, a passenger in the vehicle being driven by Zienkiewicz, sustained serious injuries including an intracranial subarachnoid hemorrhage, lacerations of internal organs, cognitive deficits and numerous fractures. Her claimed damages from the collision are in the millions of dollars.

¶ 8      At the time, Tufano was covered under an auto insurance policy that had been issued by plaintiff, Emcasco, to Earle Tufano and Mary S. Tufano. The Emcasco policy provided underinsured-motorist coverage with a combined single limit of $500,000 per accident.

¶ 9      Zienkiewicz's vehicle was insured by State Farm Insurance Company (State Farm) with bodily injury limits of $300,000 per person and $300,000 per each accident. State Farm paid $295,000 to Tufano. Mann's vehicle was insured with Allstate Insurance Company (Allstate) with bodily injury limits of $100,000 per person and $300,000 per each accident. Allstate paid $100,000 to Tufano. Because the policy limits on each of these policies were less than the underinsured-motorist insurance policy limit held by Tufano, both Zienkiewicz's and Mann's vehicles were, by definition, "underinsured." See 215 ILCS 5/143a-2(4) (West 2012) ("underinsured motor vehicle" means a motor vehicle involved in a bodily injury or death where the coverage on that vehicle is less than the insured's underinsurance coverage limit).

¶ 10     Tufano's underinsured-motorist coverage with Emcasco provided as follows:

        "Underinsured Motorists Coverage"

                          * * *

        LIMIT OF LIABILITY

The limit of liability shown in the Schedule or in the Declarations for Underinsured Motorist Coverage is our maximum limit of liability for damages because of 'bodily injury' resulting from any one accident. This is the most we will pay regardless of the number of:

1. 'Insureds';

2. Claims made;

3. Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the accident."

The Emcasco policy also contained the following "set off" provision:

"Except in the event of a 'settlement agreement,' the limit of liability for this coverage shall be reduced by all sums paid because of the 'bodily injury' by or on behalf of persons or organizations who may be legally responsible."

¶ 11    After recovering payment from Zienkiewicz's and Mann's insurers for the combined total of $395,000, Tufano made a claim under the Emcasco policy for underinsured-motorist coverage. Pursuant to the above policy provisions, Emcasco provided Tufano with $105,000 in underinsured-motorist coverage for her injuries ($500,000 minus $395,000). Tufano accepted the payment but with a reservation of rights, maintaining that she was entitled to additional payment, specifically that Emcasco was obligated to provide $500,000 of underinsured-motorist coverage for *each* underinsured tortfeasor involved in the collision.

¶ 12    Emcasco filed a complaint for declaratory judgment against defendants seeking a determination that it was not obligated to provide any additional coverage to Tufano. Emcasco then moved for judgment on the pleadings, claiming that it owed Tufano nothing more than the $105,000 it already paid.

¶ 13     Tufano moved for summary judgment, claiming that the policy provisions on which

Emcasco relied violated the public policy of placing an insured in the same position she would

have been in had the two drivers been insured to the extent of her underinsured-motorist

coverage, $500,000. Had each of these drivers had $500,000 in coverage, she argued, she would

have received $1 million from them collectively, but instead she only received $395,000 due to

the limits of their insurance coverage. Thus, in her view, Emcasco owed her the difference

between what she did receive and what she should have received, or $605,000.[1]

¶ 14     After hearing arguments on the cross-motions, the trial court granted judgment on the

pleadings in favor of Emcasco and denied Tufano's motion for summary judgment. This appeal

followed.

¶ 15                                             II. ANALYSIS

¶ 16                                    A. Emcasco's Liability to Tufano

¶ 17     We review *de novo* a circuit court's rulings on both a motion for summary judgment and

a motion for judgment on the pleadings. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL

113836, ¶ 65. Summary judgment is proper only where the pleadings, depositions, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

[1]Both parties here refer to the Emcasco policy's limit of liability provision as the "anti-stacking provision." Generally, "[a]n insurance provision that limits the total liability from all policies to that of the single policy providing the highest limit is referred to as an 'antistacking provision.'" *State Farm Mutual Automobile Insurance Co. v. McFadden*, 2012 IL App (2d) 120272, ¶ 14. "The legislature has specifically allowed application of antistacking clauses to [underinsured-motorist] coverage in section 143a-2(5) of the Illinois Insurance Code ***. [Citation.]" *Hall v. Burger*, 277 Ill. App. 3d 757, 762 (1996). This case does not involve the typical scenario of an insured with multiple policies. Instead, it involves the insureds' single policy and its single limit of liability of $500,000. Neither party disputes that the limit at issue is $500,000; instead, they dispute whether it may be applied to *each* tortfeasor, essentially resulting in a $1 million limit, before any offsets are applied. Because this issue is distinguishable from the issue of interpreting an antistacking provision in the context of an insured who has multiple policies, we choose to refer to the provision as the "limit of liability provision."

any material fact and that the moving party is entitled to a judgment as a matter of law. *Id*. Similarly, a judgment on the pleadings is properly granted if the pleadings alone disclose no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Gillen v. State Farm Mutual Automobile Insurance Co*., 215 Ill. 2d 381, 385 (2005). Where parties file "cross-motions" for judgment on the pleadings and summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record. *Allstate Property & Casualty Insurance Co. v. Trujillo*, 2014 IL App (1st) 123419, ¶ 15. We agree with the parties that this case involves only a question of law, the interpretation of the Emcasco policy.

¶ 18      An insurance policy is a contract subject to the same rules of interpretation that govern the interpretation of contracts. *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 433 (2010). The interpretation of a contract is also a question of law. *Avery v. State Farm Mutual Automobile Insurance Co*., 216 Ill. 2d 100, 129 (2005). Our primary goals are to determine the parties' intent in agreeing to the terms of the policy and to give effect to that intent, as expressed through the language of the policy. *Bartkowiak v. Underwriters at Lloyd's, London*, 2015 IL App (1st) 133549, ¶ 28.

¶ 19      We apply the clear and unambiguous provisions in an insurance policy as written unless such application violates public policy. *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd*., 223 Ill. 2d 407, 416-17 (2006); *State Farm Mutual Automobile Insurance Co. v. Villicana*, 181 Ill. 2d 436, 442 (1998). Whether an agreement is contrary to public policy depends on the particular facts and circumstances of the case. *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co*., 215 Ill. 2d 121, 130 (2005).

¶ 20     Insurance policy provisions are considered ambiguous if they are subject to more than one reasonable construction. *Dungey v. Haines & Britton, Ltd.*, 155 Ill. 2d 329, 336 (1993). Even if the language in an insurance policy is clear and intelligible and suggests but a single meaning, a "latent ambiguity" may arise where "some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice between two or more possible meanings. [Citation.]" (Internal quotation marks omitted.) *Hoglund v. State Farm Mutual Automobile Insurance Co.*, 148 Ill. 2d. 272, 279 (1992). When a provision in an insurance policy is ambiguous or is susceptible of at least two reasonable interpretations, it should be construed in favor of the insured. *Hall v. Burger*, 277 Ill. App. 3d 757, 761 (1996).

¶ 21     We begin by acknowledging that Emcasco's position is supported by the plain language of the insurance policy. As previously detailed, the policy contains a set-off provision that says Emcasco's $500,000 underinsured-motorist coverage "shall be reduced by *all* sums paid because of the 'bodily injury' by or on behalf of persons or organizations who may be legally responsible." (Emphasis added.) On its face, that language could not be any clearer; it allows Emcasco to add up all of the money received by Tufano from all tortfeasors and deduct that sum from any underinsurance coverage Emcasco owes her. Thus, were we to follow the plain language of the policy, Emcasco would be correct that it could offset all of the $395,000 Tufano received from the two drivers and thus would owe Tufano only $105,000.

¶ 22     But the case law has made it clear that, in the context before us, where multiple tortfeasors are involved and the insurer wishes to offset the collective payments made by all tortfeasors against the underinsurance coverage, the plain language of the policy is not the end of the inquiry. The court must also consider whether application of the policy language violates the public policy behind the underinsured-motorist statute. See *King v. Allstate Insurance Co.*, 269

Ill. App. 3d 190, 193 (1994); *Hall*, 277 Ill. App. 3d at 763-64; see also *Hoglund*, 148 Ill. 2d at 279 (concerning uninsured-motorist coverage). We will thus turn to a discussion of that public policy.

¶ 23    In *Sulser v. Country Mutual Insurance Co.*, 147 Ill. 2d 548, 558 (1992), the court concluded that the legislature's purpose in enacting underinsured-motorist coverage was to place the insured in the same position he would have occupied if injured by a motorist who carried liability insurance in the same amount as the policyholder. See also *State Farm Mutual Automobile Insurance Co. v. Villicana*, 181 Ill. 2d 436, 442-46 (1998) (reiterating same public policy underlying underinsured-motorist coverage). The court in *Sulser* additionally observed that underinsured-motorist coverage was "designed to offer insurance to 'fill the gap' between the claim and the tortfeasor's insurance" and, as such, it "was obviously not intended to allow the insured to recover amounts from the insurer over and above the coverage provided by the underinsured motorist policy." *Sulser*, 147 Ill. 2d at 556.

¶ 24    In *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48 (2011), the court discussed the relationship between all statutorily required insurance–liability, uninsured-motorist, and underinsured-motorist coverage. *Id*. at 69. The court explained that, similar to the situation where an insured is injured by an *uninsured* motorist, if the at-fault driver is *underinsured*, the insured's underinsured-motorist coverage ensures that the insured will still be compensated for his damages "up to the limits of" and "to the extent bargained for under" his own insurance policy. *Id*.; see also *Sulser*, 147 Ill. 2d at 556.

¶ 25    Generally speaking, three separate principles emerge from this case law: (1) underinsured-motorist coverage should place the insured in the same position he or she would have occupied if the tortfeasor had carried insurance in the same amount as the insured; (2)

underinsured-motorist coverage exists to fill the gap between the amount received from the tortfeasor's insurance and the amount of the insured's underinsured-motorist policy limit; and (3) underinsured-motorist coverage is not intended to allow the insured to recover amounts from the insurer *over and above* the insured's underinsured-motorist policy limit.

¶ 26    In a scenario involving a single claimant and a single tortfeasor, there is no reason why these principles should conflict. For example, suppose that Claimant carries underinsured-motorist insurance of $500,000. She suffers injuries in a car accident, with damages exceeding $500,000. She sues Tortfeasor for personal injuries she incurred in the collision. If Tortfeasor only has $300,000 in liability insurance and tenders the full amount to Claimant, Claimant can invoke the underinsured-motorist coverage for the remaining $200,000. That gives Claimant $500,000 total, which puts her in the same position as if Tortfeasor had carried the same amount of insurance as she. It would also "fill the gap" between the amount received from Tortfeasor and Claimant's underinsured-motorist coverage. And it would not force the insurer to cover Claimant over and above her underinsured-motorist policy limit, because she was insured for $500,000, and the insurer only had to give her $200,000.

¶ 27    But the situation becomes more complicated when, as here, there are multiple tortfeasors. For example, in the present case, to satisfy the second principle–to merely "fill the gap" between what Tufano received from the two drivers and the limit of her underinsured-motorist policy– Emcasco would only owe the difference between $500,000 and the $395,000 she collectively received from the two drivers, or $105,000. But that would not satisfy the first principle, to place Tufano in the same position as if *both* at-fault drivers had $500,000 in insurance coverage, which would entitle Tufano to $1 million overall ($395,000 from the drivers, with Emcasco making up the remainder of $605,000). And if we exalted the first principle over the second principle and

permitted Tufano to collect $605,000 from Emcasco to get her to a full million dollars, we would

be violating the third principle–that the insurer not be forced to pay more than the underinsured-

motorist policy limit. We would be forcing Emcasco to pay Tufano $605,000 when it only

promised to cover her up to $500,000, and she only paid for $500,000 in coverage through her

premiums.

¶ 28    Fortunately, the case law has reconciled these apparent tensions. See *Hoglund*, 148 Ill. 2d

at 279; *King*, 269 Ill. App. 3d at 193; *Hall*, 277 Ill. App. 3d at 763-64. We will consider these

decisions below.

¶ 29    In *Hoglund*, 148 Ill. 2d at 274, the plaintiff, Hoglund, was a passenger in a car that

collided with a motorcycle. She sued the drivers of both the car and of the motorcycle, claiming

damages in excess of $200,000. *Id*. The driver of the car had liability insurance in the amount of

$100,000 and paid it to the plaintiff. *Id.* at 278. The motorcycle driver was uninsured. *Id*. The

plaintiff attempted to collect on her $100,000 uninsured-motorist coverage with State Farm, but

State Farm argued that it was contractually entitled to set off the $100,000 that the plaintiff

received from the car driver, and thus State Farm owed nothing in uninsured-motorist coverage.

*Id*. at 276.[2]

¶ 30    The supreme court agreed that the plain language of the policy supported State Farm's

claim of a setoff. *Id*. at 278. The court wrote that, "[w]ere our analysis to stop there, we would

have to conclude that the position of State Farm is correct, and Miss Hoglund would get nothing

under her father's policy. Our analysis, however, does not stop there." *Id*.

---

[2]*Hoglund* was actually a consolidated case with two plaintiffs in substantially the same situation. *Hoglund*, 148 Ill. 2d at 274. While the court applied the same reasoning and issued the same ruling as to each plaintiff, it focused more in its discussion on the facts of plaintiff Hoglund's case, and thus we focus our discussion primarily on that portion of the case.

¶ 31    The court reasoned that the setoff provision, no matter how unambiguous it might appear, had to be read in conjunction with the policyholder's reasonable expectations and in accordance with the public policy behind the uninsured-motorist statute. *Id*. at 279. The court found a "latent ambiguity" in the setoff provision because it did not account for a situation involving multiple tortfeasors, whose payments could be stacked together to deprive a claimant of some or all of the uninsured-motorist insurance she purchased and reasonably expected to cover her. *Id*. The court explained that the purpose of the uninsured-motorist statute is to place the injured party in substantially the same position she would be in if the uninsured driver had been insured, but that:

> "If the position of State Farm were to be adopted *** this purpose would be
>
> frustrated. If, for instance, the uninsured motorcycle driver had been insured for
>
> $100,000, Miss Hoglund could have collected that sum in full from that driver's
>
> insurer, along with the $100,000 she collected from the other insured driver. The
>
> separate collections of $100,000 from each of the two culpable drivers would
>
> have fully compensated her for her $200,000 in damages. State Farm's position,
>
> however, is to insist that it receive a full setoff for the payment made on behalf of
>
> the insured driver. Such a result would violate the public policy behind the
>
> uninsured motorist statute that the injured party be placed in the same position as
>
> if the uninsured driver had been insured." *Id*. at 280.

¶ 32    Thus, in light of this public policy and the existence of multiple at-fault drivers in that case, the setoff provision was latently ambiguous, and the ambiguity was construed, as always in an insurance policy, in favor of the insured, Hoglund. *Id*. The court ruled that State Farm could not set off the $100,000 paid by the insured driver against its uninsured-motorist coverage for the uninsured-motorcycle driver. *Id.* at 280-81

¶ 33    It is true that *Hoglund* involved uninsured-motorist coverage, whereas this case involves underinsured-motorist insurance. But the public policies behind each are the same, to place the policyholder in the same position as if the uninsured or underinsured motorist were insured to the same extent as the policyholder. See *Sulser*, 147 Ill. 2d at 558 ("In enacting both [the uninsured- and underinsured-motorist statutes], the legislature intended to place the insured in the same position he would have occupied if injured by a motorist who carried liability insurance in the same amount as the policyholder."); see also *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 405 (2010) ("our court has specifically held that [uninsured-motorist] and [underinsured-motorist] coverage were mandated by the legislature for the same reason, namely, to place an insured in the same position he or she would have occupied had the tortfeasor carried adequate insurance").

¶ 34    And subsequent decisions have applied *Hoglund* to the facts similar to the ones before us, involving underinsured-motorist coverage in the context of multiple at-fault drivers.

¶ 35    In *King*, 269 Ill. App. 3d 190, this court extended the holding in *Hoglund* to a factual situation involving one fully insured tortfeasor and a second tortfeasor who was underinsured, instead of uninsured. The plaintiff, while riding a bicycle, was injured in a two-car accident. *Id*. One of the drivers had liability insurance of $100,000, and the other driver had $20,000 in liability insurance. *Id*. Each driver paid the plaintiff the limits of insurance, giving him $120,000. *Id*. The plaintiff himself had an underinsured-motorist policy of $50,000 that had a setoff provision similar to that in this case, which unambiguously permitted the insurer to set off amounts paid by all tortfeasors against the underinsurance coverage. *Id*. at 191. Based on that setoff provision, the insurer claimed that it could deduct the $120,000 received from both drivers against its $50,000 underinsured policy, leaving the insurer with nothing to pay. *Id*. at 194.

¶ 36    The insurer argued that *Hoglund* was not applicable because that case involved an uninsured-motorist, not an underinsured-motorist, policy. The insurer further argued that the decision in *Sulser*, 147 Ill. 2d at 556, where the supreme court stated that the purpose of underinsurance is to " 'fill the gap' " between what the policyholder received from tortfeasors and the limit of the underinsurance coverage, required the court to enforce the setoff provision. *King*, 269 Ill. App. 3d at 194. Based on the reasoning in *Sulser*, the insurer argued, there was no gap to fill, because the $120,000 the plaintiff received from the drivers far exceeded the $50,000 in coverage under the underinsured-motorist policy.

¶ 37    This court rejected these arguments. Noting that "the public policy considerations behind both uninsured-motorist coverage and underinsured-motorist coverage are similar rather than distinct," the court found *Hoglund* applicable to the facts of the case. *Id*. at 194. The court reasoned that "to allow the total $120,000 setoff claimed by the [insurer] would effectively negate the plaintiff's $50,000 underinsured-motorist coverage. Relying on the analogous holding in *Hoglund*, this would violate the public policy behind underinsured motorist coverage." *Id*. The court thus held that the plaintiff could be entitled to up to $30,000 in underinsured-motorist coverage to make up for the difference between the second, underinsured driver's $20,000 policy and the plaintiff's $50,000 underinsured-motorist coverage. *Id*. at 195.

¶ 38    In *Hall*, 277 Ill. App. 3d at 759, the plaintiff's decedent was hit and killed by a car. There were two tortfeasors—the driver and the vehicle's owner—both of whom were underinsured. The driver was insured for $50,000, the owner for $25,000, and each of them paid the policy limits to plaintiff. *Id*. The plaintiff had $100,000 in underinsured-motorist coverage. *Id*. at 763. The underinsured-motorist policy contained an offset provision that, like the one in this case, permitted the insurer to set off all sums received from all tortfeasors against its underinsured-

motorist limit. *Id*. Using the same reasoning employed by Emcasco in this case, the insurer argued that it was only liable for $25,000 in underinsured-motorist coverage after deducting the amounts already paid by the two tortfeasors collectively ($75,000) from its $100,000 underinsurance policy limit.

¶ 39    This court grappled with whether the setoff provision was unambiguous but held that, even if it was, the provision "would be against public policy, and the clause could not be given effect as written." *Id*. This court relied on *Hoglund* and *King* to hold that the insurer's double-offset was impermissible. The court, noting that "[t]he purpose of [underinsured-motorist] coverage is to put the insured in the same position as if injured by a motorist with insurance in the same amount of as the [underinsured-motorist] policy," reasoned that this purpose would be frustrated if plaintiff's recovery were limited to the sum of $100,000 ($75,000 from the two drivers plus $25,000 from the underinsurance carrier) because that result would not properly account for the fact that there were two tortfeasors instead of one. *Id*. at 765. To put the plaintiff in the same position as if *each* tortfeasor were insured as fully as the plaintiff, the plaintiff would be entitled to $200,000 in underinsurance coverage, less the amount already paid by the two tortfeasors ($75,000), for a total of $125,000.

¶ 40    But the court also recognized that it was not possible to put the plaintiff in *precisely* the same position as if both tortfeasors had been insured as fully as the plaintiff—which would give her $125,000—because the plaintiff's underinsured-motorist policy had a limit of $100,000. *Id*. Thus, given the limits of the underinsured-motorist policy, the plaintiff was entitled to the full $100,000 of the underinsured-motorist policy, but no more. *Id*.

¶ 41    The lesson from these cases is straightforward. Where multiple tortfeasors are involved in an accident in which an underinsured-motorist policyholder is injured, the policyholder must be

placed in the same position as if *each* tortfeasor carried the same amount of insurance as the policyholder. One tortfeasor's payment cannot be used to offset the underinsurance gap of another tortfeasor; each instance of underinsurance must be viewed distinctly. See *Hoglund*, 148 Ill. 2d at 279; *King*, 269 Ill. App. 3d at 193; *Hall*, 277 Ill. App. 3d at 763-64. But the amount of coverage the policyholder can receive from the underinsured-motorist carrier is capped by the overall limit of the underinsured-motorist policy, because the insurer should not be required to pay a policyholder more than it promised, or more than the amount for which the policyholder paid in premiums. *Sulser*, 147 Ill. 2d at 556; *Rosen*, 242 Ill. 2d at 69; *Hall*, 277 Ill. App. 3d at 765.

¶ 42    Based on this precedent, the outcome of this case is clear. Emcasco may not collectively offset the sum total paid by the two drivers ($395,000) from its $500,000 underinsured-motorist policy and claim that it only owes Tufano $105,000. Tufano is entitled to a separate consideration of each underinsured driver's payment. She would theoretically be entitled, then, to receive $400,000 in underinsurance coverage for the first driver (who was only insured for $100,000) and $205,000 in underinsurance coverage for the second driver (who paid $295,000), for a total of $605,000. However, because her underinsured-motorist policy limit was $500,000, she cannot receive more than that limit. Tufano is thus entitled, at most, to the full limit of her underinsured-motorist policy, $500,000.[3]

¶ 43    We reject Emcasco's reliance on case law involving single-tortfeasor situations. The decisions in *Erie Insurance Exchange v. Triana*, 398 Ill. App. 3d 365, 367 (2010), *Wehrle v. Cincinnati Insurance Co.*, 719 F.3d 840, 842 (7th Cir. 2013), *Marroquin v. Auto-Owners*

---

[3]As we previously noted, Emcasco already paid Tufano $105,000, which Tufano accepted under a reservation of right. As Tufano concedes, any amount owed by Emcasco following the trial court's evidentiary hearing will contain a credit for this amount.

*Insurance Co.*, 245 Ill. App. 3d 406, 408 (1993), and *Obenland v. Economy Fire & Casualty Co.*, 234 Ill. App. 3d 99, 110-11 (1992), all involved multiple insureds injured by a single tortfeasor, not a single insured injured by multiple tortfeasors.

¶ 44    That distinction is critical. As we have explained, cases involving multiple tortfeasors uniquely implicate the public policy of the state and render the traditional setoff provisions in underinsured-motorist provisions latently ambiguous. See *Hoglund*, 148 Ill. 2d at 279-80. The concern of double offset of multiple tortfeasors' payments obviously cannot be present when there is only one tortfeasor. See *King*, 269 Ill. App. 3d at 194 ("Several cases which the parties rely on and discuss [including *Obenland*] are factually distinguishable because although they involved underinsured motorist coverage, there was only one at-fault driver"); *Hall*, 277 Ill. App. 3d at 765 (distinguishing cases involving only one tortfeasor).

¶ 45    This court has repeatedly explained that "*Hoglund* does not apply in situations involving a single tortfeasor." *Zdeb v. Allstate Insurance Co.*, 404 Ill. App. 3d 113, 121 (2010); see also *State Farm Mutual Automobile Insurance Co. v. Coe*, 367 Ill. App. 3d 604, 615 (2006) ("reliance on *Hoglund* is misplaced. \*\*\*. In the present case, there is only one tortfeasor."); *Banes v. Western States Insurance Co.*, 247 Ill. App. 3d 480, 484-85 (1993) ("Since there is only one tort-feasor here, there is no latent ambiguity in the policy."); *Darwish v. Nationwide Mutual Insurance Co.*, 246 Ill. App. 3d 903, 907-08 (1993) (same). Indeed, two of Emcasco's cited cases specifically noted the distinction between the single-tortfeasor situation in those cases and *Hoglund*'s multiple-tortfeasor scenario. See *Marroquin*, 245 Ill. App. 3d at 408; *Obenland*, 234 Ill. App. 3d at 110-11.

¶ 46    Likewise, Emcasco's reliance on *Sulser* does not advance its position. It is true that *Sulser* referred to an underinsured-motorist policy as a "gap-filler" to ensure the policyholder "of

receiving that portion of the [underinsured-motorist coverage] which is not recovered from third parties." *Sulser*, 147 Ill. 2d at 556. The use of the plural might suggest that the supreme court was supporting the position advanced here by Emcasco, that it may stack up all recoveries from all tortfeasors, collectively, and offset them against its $500,000 of coverage. But we reject that interpretation for several reasons. First, the supreme court was not considering the unique instance of multiple tortfeasors, as it was in *Hoglund*. See *Trujillo*, 2014 IL App (1st) 123419, ¶ 42 (distinguishing *Sulser* on this basis); *Hall*, 277 Ill. App. 3d at 767 (distinguishing *Sulser* on this basis). Second, the supreme court in *Sulser* also noted the public policy behind underinsured-motorist coverage as placing the policyholder in the same position as if the underinsured tortfeasor carried the same amount of insurance as the policyholder. *Sulser*, 147 Ill. 2d at 558. The supreme court would have had no occasion to reconcile any apparent conflict between these two principles in *Sulser*, because it was not presented with a multiple-tortfeasor scenario.

¶ 47    Some courts have recognized this perceived "tension" between *Sulser*'s reference to underinsured-motorist protection as a "gap-filler" and *Hoglund*'s emphasis on placing the policyholder in the same position as if the tortfeasors had carried the same amount of insurance as the policyholder. See *Trujillo*, 2014 IL App (1st) 123419, ¶ 42; *Hall*, 277 Ill. App. 3d at 767. In each of those cases, involving multiple tortfeasors, the courts applied *Hoglund* and reached the result that we have in this case. *Trujillo*, 2014 IL App (1st) 123419, ¶ 42; *Hall*, 277 Ill. App. 3d at 767.

¶ 48    In our view, there is no need to go even that far. We find no tension between these two purposes, provided that one considers that, in the multiple-tortfeasor context, the gap-filling is performed as to each tortfeasor *individually*, instead of collectively. Here, for example, our holding that Tufano should be entitled to $605,000–though capped at the $500,000 policy limit–

is really just another way of saying that she should be entitled to fill the gap between the first driver's insurance ($100,000) and her policy limit, and then to fill the gap between the second driver's insurance ($295,000) and her policy limit, thus adding $400,000 and $205,000 for a total of $605,000. We think the gap-filling purpose as enunciated in *Sulser* is perfectly consistent with the purpose of placing the policyholder in the same position as if both drivers had been similarly insured, as emphasized in *Hoglund*.

¶ 49    Tension or not, we apply *Hoglund* to this case. Tufano would ordinarily be entitled to $605,000 in underinsured-motorist coverage in this case, but because that amount exceeds the limit of her policy, she may receive no more than that limit–$500,000–and with credit for amounts Emcasco already paid Tufano.

¶ 50                              B. Tufano's Damages in This Case

¶ 51    We have thus far discussed the question of underinsured-motorist coverage on the assumption that Tufano's damages from the car accident are sufficient to require the full payment of underinsured-motorist coverage. She claims damages in the millions, and the description of her injuries suggest they are significant, but we are in no position to evaluate her damages at this stage. The court ruled on a motion for judgment on the pleadings without hearing any evidence. Nor is there any stipulation or concession before us regarding Tufano's injuries.

¶ 52    This is important because even if a policyholder, theoretically, is entitled to underinsured-motorist coverage, it is always possible that the policyholder's actual damages in a given case are no greater (or less than) what she already received from the tortfeasors, in which case collecting anything from the underinsured-motorist carrier would constitute a double recovery. See *Hoglund*, 148 Ill. 2d at 280; *King*, 269 Ill. App. 3d at 195; see also *Trujillo*, 2014 IL App (1st) 123419, ¶ 44.

¶ 53    Tufano has already received $395,000 from the two drivers. It is within the realm of possibility that this amount has already covered all the damages she actually suffered in this case. If so, the question of underinsured-motorist coverage is academic. She is obviously not entitled to a double recovery. The question of Emcasco's liability to Tufano is thus dependent, first and foremost, on a determination that she suffered damages greater than the $395,000 she already received from the two drivers.

¶ 54    It is not uncommon in cases like this for the liability question to be determined by the trial court on a dispositive motion at trial, before the factual question of damages is resolved. *Hoglund*, a consolidated case, is a good example of both ways this can work. As to one of the plaintiffs in that case, Hoglund, the insurance company stipulated that her damages were so high that they clearly exceeded all insurance coverage, negating any possibility of a windfall by Hoglund. *Hoglund*, 148 Ill. 2d at 276-77. But the actual damages suffered by the other plaintiff, Greenawalt, had not been fixed. *Id*. at 277. As to the Greenawalt plaintiff, the supreme court affirmed the appellate court's remand of the matter to the circuit court for a determination of Greenawalt's damages to ensure that she actually suffered damages from her accident that exceeded what the tortfeasors had already paid her–that is, to "prevent a double recovery" by Greenawalt. *Id.* at 280-81.

¶ 55    Likewise, the court in *King* recognized that, due to the posture of that case, the total extent of the plaintiff's damages were not currently known. *King*, 269 Ill. App. 3d at 195. The plaintiff had already received $120,000 from the two at-fault drivers, and by the court's ruling was entitled to up to $30,000 more in underinsured-motorist coverage, but the court could not say as a matter of law that the plaintiff's total damages were as high as $150,000, or even one dollar more than $120,000. The court thus remanded the case for a determination of plaintiff's

damages to ensure that its ruling did not permit the plaintiff to obtain a double recovery. *Id*.; see also *Trujillo*, 2014 IL App (1st) 123419, ¶ 44 (remanding for determination of damages to ensure policyholder did not obtain double recovery).

¶ 56     A remand is thus necessary in this case for a factual determination of Tufano's actual damages from the car accident. If her actual damages are less than or equal to the $395,000 she has already received from the two drivers, she is entitled to nothing further from Emcasco. If her damages exceed $395,000, she is entitled to underinsured-motorist coverage to the extent necessary to make her whole, but capped at an additional payment of $500,000 from Emcasco and crediting the amount that Emcasco has already paid her.

¶ 57                                   III. CONCLUSION

¶ 58     The circuit court's order, entering judgment on the pleadings in favor of Emcasco and denying Tufano's motion for summary judgment, is vacated. The cause is remanded with instructions to enter summary judgment in favor of Tufano on the question of liability. On the question of damages, the trial court shall conduct a hearing as described herein to determine the overall extent of damages suffered by Tufano in the car accident. The court must award damages in favor of Tufano and against Emcasco only to the extent necessary to avoid a double recovery, capped at a total payment by Emcasco of $500,000, and with credit for amounts already paid by Emcasco.

¶ 59     Vacated and remanded with instructions.