2023 IL App (1st) 220879-U

No. 1-22-0879

Order filed April 24, 2023.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JAMES IVETIC, on his own behalf and on behalf of his spouse, Nancy Ivetic, and NANCY IVETIC, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 2019 CH 4304 |
| BENSENVILLE FIRE PROTECTION DISTRICT NO. 2, | ) ) | The Honorable Caroline Kate Moreland, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1     *Held*: Defendant Bensenville Fire Protection District No. 2 was obligated to pay the health insurance premiums for plaintiffs James and Nancy Ivetic where it was undisputed that James was awarded a line-of-duty disability pension, and therefore suffered a "catastrophic injury" as a matter of law, and where the evidence showed that said injury occurred during an emergency response. Accordingly, the circuit court properly granted summary judgment to plaintiffs on that basis. We affirm.

¶ 2     James Ivetic developed a debilitating form of cancer during the course of his nearly 30-year career as a firefighter with the Bensenville Fire Protection District No. 2 (District). After James retired, he was awarded a line-of-duty disability pension (40 ILCS 5/3-114.1 (West 2010)) by the Board of Trustees of the Bensenville Pension Fund (Board) after the Board determined that James' acts of duty were either the cause of or a contributing cause of his cancer. James subsequently applied for health insurance premium benefits for him and his wife, Nancy Ivetic (plaintiffs), pursuant to section 10 of the Public Safety Employee Benefits Act (Act) (820 ILCS 320/10 (West 2014)).

¶ 3     The District denied James' request, leading plaintiffs to file the instant declaratory judgment action, seeking a declaration that the District was obligated to pay their health insurance premiums. The parties filed cross-motions for summary judgment as to whether James qualified for the benefits under the Act. After considering the evidence presented at the Board's pension hearing, among other things, the circuit court determined that the District had to pay plaintiffs' health insurance premiums. The court consequently granted plaintiffs' summary judgment motion.

¶ 4     On appeal, the District argues that the circuit court erroneously granted summary judgment to plaintiffs because James did not meet the statutory requirements of suffering a catastrophic injury that resulted from his response to what is reasonably believed to be an emergency under the Act. We disagree, and for the reasons that follow, we affirm the circuit court's judgment.

¶ 5                              I. BACKGROUND

¶ 6     The following relevant facts are not in dispute.

¶ 7      James became a firefighter with the District on April 17, 1979. He was eventually promoted to Lieutenant in 1985. During the course of his career, James responded to numerous structural, house and dumpster fires. In performing these duties, James was exposed at various times to certain chemicals, fertilizers and radiation, some of which were known or suspected carcinogens. James was also exposed to carcinogens from other sources unrelated to his employment with the District, as will be discussed in more detail below.

¶ 8      In January 2008, James was diagnosed with a condition called non-disabling small lymphocytic lymphoma which later evolved and developed into chronic lymphocytic leukemia (CLL/SLL), requiring a complete bone marrow transplant and resulting in total disability. James' bone marrow biopsy confirmed that his cancer was Stage IV. According to his primary doctor, James had been suffering from the cancer for at least two years. James received a second opinion from Patricia Madej, M.D., who recommended a form of chemotherapy treatment called Rituxan. James underwent treatment and continued working for the District until June 2008, when he retired.

¶ 9      In October 2012, James applied for a line-of-duty disability pension, or alternatively, an occupational disease disability pension. The Board initially sought guidance from the Illinois Department of Insurance as to whether James, a retired firefighter, was eligible to seek disability pension benefits for his cancer. The Illinois Department of Insurance issued an advisory opinion that stated:

> "It is the opinion of the Public Pension Division of the Department of Insurance that once a firefighter retires or is in receipt of a retirement pension under 40 ILCS 5/4-109, the firefighter has terminated service with the fire department, is no longer in active service and is no longer eligible to receive a disability pension benefit from the pension

fund. Retirement benefits only cease to be paid if the individual is rehired into the fire service of the municipality (40 ILCS 5/4-117), the individual is deceased (40 ILCS 5/4-114) or the individual is convicted of a felony relating to service as a firefighter (40 ILCS 5/4-138).

Article 4 does provide a firefighter in receipt of a disability pension the ability to convert the disability pension to a retirement pension (40 ILCS 5/4-113). However, it does not provide the ability to convert a retirement pension to a disability pension. Based on the above, the Board would appear to lack the authority to shift a previous retirement award under 40 ILCS 5/4-109 to a disability pension."

After receiving the Department's advisory opinion, the Board conducted a special meeting regarding James' pension application. The Board then dismissed James' application without holding an evidentiary hearing, concluding that James was not entitled to either a line-of-duty disability pension or an occupational disease disability pension as a matter of law because the Board lacked jurisdiction to undertake a pension disability hearing for a retired firefighter. While James was allowed to address the Board following its decision, he was not allowed to present any medical records or medical testimony at that time.

¶ 10      James subsequently filed a complaint for administrative review against the Board in the circuit court of Cook County, alleging, in the main, that the Board erred by not affording him an evidentiary hearing on his pension application. The circuit court ultimately agreed, and in a lengthy decision issued on March 12, 2014, the court reversed the Board's decision and remanded the matter for a full evidentiary hearing on James' application. In reaching its decision, the court found that a retired firefighter, like James, is eligible to apply for a line-of-duty

disability pension. The court, however, found that a retired firefighter is not eligible to apply for an occupational disease disability pension under the law.

¶ 11                                   A. The Board's Evidentiary Hearing

¶ 12    The Board held a hearing on James' pension application beginning on September 18, 2015. The evidence showed that James worked at a restaurant and a grocery store prior to becoming a firefighter. Additionally, during his career as a firefighter, James worked a number of part-time jobs, including being taxi and truck drivers and remodeling homes. James admitted that he was likely exposed to some chemicals from his part-time jobs, like oil-based paints and wallpaper removing chemicals.

¶ 13    As to his exposure to chemicals from his work as a firefighter, James testified that he often worked twenty-four-hour shifts, and that he lived and slept at the station where the fire equipment was housed. Each morning James would "test vehicles by running them for 15 or 20 minutes, test all the pumps, make sure the vehicle[s] started, [make sure] nothing was leaking, [and] all the equipment was on the vehicle." He was often exposed to fumes during these tasks. Specifically, James noted that the station had an old Mack truck that would "smoke a lot." At the time there was an "inadequate ventilation system" which led to the whole floor getting "smoked out." James testified: "You would go on break and the smoke would waft into the station. Sometimes the secretary would tell you her eyes are burning, can we shut [the] vehicles off." James further testified:

> "Our apparatus room floors always had film on them. We tried washing them down just with regular soap and water. We've done that twice. I think we had *** an outside agency paint and they had to wash everything down again because you would see it leaking on the walls."

¶ 14    In addition, although James had "bunker gear" on when he responded to fires, he sometimes entered burning buildings without an air supply since air packs were not mandated until later in his career. Moreover, James, in responding to fires, had to remove ceilings or walls consisting of insulation, drywall and/or plaster, to make sure there was no fire behind them. According to James, fire reside was often on his clothing and bunker gear:

>  "If it was a house fire at the start, it would be – well, even at the end, you would still have residue of black smoke on it. It smelled like a fire. Your clothes could be wet. They could be soaked with whatever…. was in that building [that] got on you, whatever melted in the building."

James explained there was little to no cleaning protocol for the firefighters' gear: "We would use a garden hose or you would wash your gear once in a great while. Nothing never really got cleaned."

¶ 15    In addition to James' testimony, the Board considered three independent medical evaluations of James by physicians Olga Frankfurt, M.D., Richard Larsen, M.D., and Peter Orris, M.D. We note that all three physicians concluded that James' cancer caused him to become permanently disabled for service as a firefighter.

¶ 16    As to the cause of James' cancer, Dr. Frankfurt opined:

>  "It is medically possible that development and/or progression of [James'] CLL/SLL occurred as a result of exposure to chemicals and fumes that [James] had been exposed to while performing his duties as a fire fighter [*sic*]. However, there is no medical literature directly linking fire-fighting occupation and CLL/SLL. Based on the available clinical trials conducted to identify risk factors for development of CLL/SLL, history of living or working on a farm (particularly crop farming, which suggest exposure

to fertilizer) was significantly associated with development of CLL/SLL. According to [James], he has been exposed to fertilizer repeatedly."

Dr. Frankfurt concluded:

"It is impossible to definitively determine weather [*sic*] above mentioned exposures have contributed to the development and/or progression of [James'] CLL/SLL. Similarly, I can not [*sic*] definitively state that such exposures had no effect of the carcinogenesis."

¶ 17    Dr. Larsen similarly opined:

"Though [James] likely had multiple exposures to a variety of unknown toxins during his work as a firefighter, there are no clearly discernable occupational or environmental risk factors that predispose to CLL/SLL. Although there has been an increase in other subtypes of leukemia and lymphoproliferative disorders with certain chemical or radiation exposures, nothing has been proven with CLL/SLL and the etiology remains unknown."

Dr. Larsen further noted:

"[James] has been exposed to aerosolized chemicals, burning barns, and significant combustion products, but there is no epidemiological evidence or proposed biological mechanism of action that we are aware of to implicate these exposures in the development of CLL/SLL."

¶ 18    Dr. Orris, on the other hand, opined that James' cancer was the direct result of his job duties. In his evaluation of James, Dr. Orris stated:

"[James'] disability is the result *** of a disabling cancer and subsequent need for treatment. It is not only medically possible, but more likely than not that repeated

exposure to carcinogens encountered while performing required duties when employed as a firefighter for the Bensenville Fire Department, contributed to his development of chronic lymphocytic leukemia."

Dr. Orris further noted:

"Firefighters are exposed to numerous combustion products that are known or suspected carcinogens according to the International Agency for Research on Cancer (IARC) (ie: polycyclic aromatic hydrocarbons, formaldehyde, benzene, chromium, dioxins, asbestos, particular matter, arsenic, and others). Exposure to those chemicals will vary depending on the source of the fire, its heat, meteorologic conditions at the time and the specific activities of the firefighter. For over half of his career, it was routine practice to wear gear and uniforms shift after shift without washing. Many of the above mentioned carcinogens had the opportunity to accumulate on this clothing, exposing him repeatedly in the firehouse as it was next to his bed and anytime he put it on again. Although [James] has worn a self-contained breathing apparatus during firefighting activities, he reports not wearing this or other respiratory protection during overhaul. Overhaul involves pulling walls and floors apart and often removing furniture to find and extinguish fires. The overhaul process can last several hours and it is during this time that there is [the] highest concern for inhalational, ingestion, as well as increased dermal exposure to the previously mentioned carcinogens as many are pyrolosis [*sic*] products of incomplete combustion and often aerosolized after a fire."

¶ 19    Finally, Dr. Orris noted that multiple studies have shown there is a "statistically significant excess risk for all cancer types among firefighters." More specifically, Dr. Orris noted that a study in the United States found that among 19,309 male firefighters, there were 1,333

cancer deaths and 2,609 cancer incidence cases. As relevant here, "[t]his study found that chronic lymphocytic leukemia compromised 32% of leukemia incidence cases and a positive association between fire-runs and leukemia mortality." In conclusion, Dr. Orris opined that, more likely than not, James' cancer was "in part a result of his exposures as a fire fighter [*sic*]."

¶ 20                                                 B. The Board's Decision

¶ 21     Following the hearing, the Board concluded that James' cancer caused him to become permanently disabled for service as a firefighter and that James had shown, by a preponderance of the evidence, that the cumulative effects of his acts of duty, either caused or more likely, were a contributing causative factor to his cancer. In reaching its decision, the Board found there was evidence that James had been exposed to certain chemicals, fertilizer and radiation both on the job and from other non-job-related sources. The Board thus awarded a line-of-duty disability pension to James.

¶ 22     James, thereafter, applied for health insurance premium benefits from the District for him and his wife. The District denied James' request, concluding that he suffered from cancer, which was a disabling "illness," rather than an "injury," and therefore, he was not entitled to the additional health insurance benefits. The District further concluded that James had not established that he was injured in the course of responding to what he reasonably believed was an emergency, as required under the Act.

¶ 23                          C. Instant Declaratory Judgment Action

¶ 24     Plaintiffs filed the instant declaratory judgment action against the District in the circuit court, seeking a declaration that the District was obligated to pay their health insurance premiums. In response, the District argued that James did not meet the statutory requirements of suffering a catastrophic injury and of having an injury that resulted from an emergency response,

and thus plaintiffs were not entitled to those additional benefits. The parties filed cross-motions for summary judgment on the issue.

¶ 25    Following briefing from the parties, the circuit court issued a lengthy decision on February 7, 2022, granting plaintiffs' motion for summary judgment. In reaching its conclusion that plaintiffs were entitled to health insurance premium benefits from the District, the court noted that the medical experts "were either inconclusive or determinative that James' [cancer] was caused by exposure to toxic substances." The court also noted that it could not "set aside the finding of the Bensenville Pension Board that James was injured in the line of duty as a result of exposure to substances while he was a firefighter." Based on that finding, the court concluded that James had satisfied the "catastrophic injury" prong of the Act. The court then concluded that the evidence showed "there were many emergencies that James responded to as a firefighter where he was exposed to substances," thereby satisfying the emergency prong of the Act. Finally, the court concluded that plaintiffs were entitled to health insurance premium benefits dating from the time James was found to be "catastrophically injured" (*i.e.*, April 22, 2016).

¶ 26    This appeal followed.

¶ 27                                         II. ANALYSIS

¶ 28    Disposition by summary judgment is appropriate when the issue presents a question of law, which, as relevant here, may involve the construction of and a determination of the parties' rights and obligations under a statute. *Oswald v. Hamer*, 2018 IL 122203, ¶ 9. Summary judgment is appropriate when no genuine issue of material fact exists such that the movants are entitled to judgment as a matter of law. *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 755 (2005). Additionally, where, as here, the parties file cross-motions for summary judgment, they concede the absence of a genuine issue of material fact and invite the

court to decide the questions presented as a matter of law. *Id.*; *Daniel v. Aon Corp.*, 2011 IL App (1st) 101508, ¶ 17; *Illinois Emcasco Insurance Co. v. Tufano*, 2016 IL App (1st) 151196, ¶ 17. As such, the sole issue before this court is whether plaintiffs were entitled to judgment as a matter of law, and as with all questions of law, our review is *de novo*. *Steadfast Insurance Co.*, 359 Ill. App. 3d at 755; *Daniel*, 2011 IL App (1st) 101508, ¶ 17. *De novo* review is also appropriate because we are construing a statute, which raises a question of law. *Village of Vernon Hills v. Heelan*, 2015 IL 118170, ¶ 18.

¶ 29      A court's primary objective in construing a statute is to ascertain and give effect to the legislature's intent. *Id.* ¶ 19. "All other rules of statutory construction are subordinate to this cardinal principle." *Roberts v. Alexandria Transportation, Inc.*, 2021 IL 126249, ¶ 29. The best indicator of legislative intent is a statute's plain language, which must be given its plain and ordinary meaning. *Id.* Additionally, a reviewing court must consider all statutory provisions as a whole. *Wells Fargo Bank Minnesota, NA v. Envirobusiness, Inc.*, 2014 IL App (1st) 133575, ¶ 16. When a statute's language is clear and unambiguous, it must be applied without resorting to other aids of construction. *Id.* Contrarily, where a statute's language is ambiguous, we may look to other sources to determine legislative intent. *Id.* A statute is ambiguous if well informed persons could reasonably interpret the same statute in more than one manner. *Id.*

¶ 30      Section 4-110 of the Illinois Pension Code (40 ILCS 5/4-110 (West 2010)), governing line-of-duty disability pensions, provides that "[i]f a firefighter, as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty, is found, pursuant to Section 4-112, to be physically or mentally permanently disabled for service in the fire department, so as to render necessary his or her being placed on disability pension, the firefighter shall be entitled to a disability pension equal to the

greater of (1) 65% of the monthly salary attached to the rank held by him or her in the fire department at the date he or she is removed from the municipality's fire department payroll or (2) the retirement pension that the firefighter would be eligible to receive if he or she retired (but not including any automatic annual increase in that retirement pension)."

¶ 31 Additionally, section 10(a) of the Act provides, in relevant part, that "[a]n employer who employs a full-time *** firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, [and] the injured employee's spouse." 820 ILCS 320/10(a) (West 2014). In order for the firefighter to be eligible for insurance coverage under the Act, "the injury or death must have occurred as the result of the *** firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act." 820 ILCS 320/10(b) (West 2014).

¶ 32                           A. "Catastrophic Injury" Prong

¶ 33 The District argues that plaintiffs were not entitled to health insurance premium benefits under the Act because James' cancer, a disease, did not constitute a "catastrophic injury," and furthermore, James did not establish that his cancer resulted from an emergency response. We disagree.

¶ 34 The Illinois supreme court has held that, where, as here, a pension board awards a line-of-duty disability pension, this establishes as a matter of law that the public safety employee has suffered a catastrophic injury under section 10(a) of the Act. In *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 400 (2003), the supreme court determined that the term "catastrophic injury," as used in section 10(a) of the Act, was facially ambiguous. *Id.* at 397. The court then considered the legislative history of House Bill 1347, which sought to enact the [Public Safety Employee

Benefits] Act, to determine the term's meaning. *Id*. at 398. Prior to the House of Representatives' initial vote on House Bill 1347, the Bill's sponsor, Representative Art Tenhouse, stated:

"1347 is a simple Bill. It simply provides that full-time law enforcement officers and firefighters that are killed *or disabled in the line of duty*, we're going to continue the health benefits for the officer's children and spouse." (Emphasis added.) 90th Ill. Gen. Assem., House Proceedings, April 14, 1997, at 180 (statements of Representative Tenhouse).

Following those remarks, House Bill 1347 passed by a vote of 113 to 4. *Krohe*, 204 Ill. 2d at 399.

¶ 35    Prior to the Senate's vote on House Bill 1347, Senator Laura Kent Donahue echoed Senator Tenhouse's sentiments, stating:

"And what this does is that it provides that for full-time law enforcement officers and firefighters that are killed *or disabled in the line of duty* shall continue the health benefits for the officer or the firefighter, their spouses and their children." (Emphasis added.) 90th Ill. Gen. Assem., Senate Proceedings, May 16, 1997, at 192 (statements of Senator Donahue).

While the Senate passed House Bill 1347, Governor Jim Edgar subsequently vetoed the Bill, leading the Senate to debate whether to override his veto. Prior to a final vote on the matter, Senator Donahue stated:

"I'd like to say for the sake of the record what we mean by catastrophically injured. What it means is that it is our intent to define 'catastrophically injured' as a police officer or firefighter who, due to injuries, has been forced to take a line of duty

disability." 90th Ill. Gen. Assem., Senate Proceedings, November 14, 1997, at 136 (statements of Senator Donahue). The Senate thereafter overrode the Governor's veto of House Bill 1347 by a vote of 58 to 1. *Krohe*, 204 Ill. 2d at 398.

¶ 36　The *Krohe* court ultimately deferred to the legislature's judgment, stating, "In light of this unambiguous legislative history, and in light of section 10(a)'s facial ambiguity, we will defer to the legislature's judgment." *Id*. at 400. The court thus construed the phrase "catastrophic injury" as synonymous with "an injury resulting in a line-of-duty disability under section 4-110 of the [Pension] Code." *Id*.

¶ 37　Similarly, in *Nowak v. City of Country Club Hill*s, 2011 IL 111838, ¶ 17, the supreme court considered the same legislative history of section 10(a) of the Act, noting that "one of [the Act's] primary purposes is to continue the provision of employer-sponsored health insurance coverage for officers and the families of officers who, due to a line-of-duty injury, have been forced to take a line-of-duty disability pension." The *Nowak* court expanded on this issue, noting that "[the Act] ensures a continuation of health insurance coverage *following the termination of the officer's employment*." (Emphasis in original.) *Id*.

¶ 38　Finally, in *Village of Vernon Hills v. Heelan*, 2015 IL 118170, the supreme court again considered this issue. The court reiterated that "proof of a line-of-duty disability pension establishes a catastrophic injury under section 10(a) of the Act as a matter of law." *Id*. ¶ 33. The court thus held that "where it is uncontroverted that a line-of-duty disability pension has been awarded, section 10(a) is satisfied, and there is no need to engage in discovery or present evidence regarding the claimant's injury." (Internal quotation marks omitted.) *Id*.

¶ 39    In this case, as set forth, it is undisputed that James was awarded a line-of-duty disability pension by the Board. Because James was awarded a line-of-duty disability pension, section 10(a) of the Act was satisfied. In other words, the line-of-duty disability pension conclusively established that James suffered a "catastrophic injury" as a matter of law. While the District urges us to depart from well-settled case law on this issue, we decline to do so. *Cf. Bremer v. City of Rockford*, 2016 IL 119889, ¶ 34 (concluding "that the legislature did not intend the phrase 'catastrophic injury' in section 10(a) of the [Act] to be synonymous with a disease resulting in the award of *an occupational disease disability pension* as defined by section 4-110.1 of the Pension Code" (Emphasis added.)).

¶ 40    We note that to the extent the District argues in its brief that James' medical condition "is, in realty, an occupational disease, regardless of what type of pension he was awarded," this is a factual issue. As stated, the parties here chose to litigate plaintiffs' declaratory judgment action through cross-motions for summary judgment, and in doing so, they agreed that no factual issues exist; rather, the decision turns on purely legal issues. Accordingly, we will not engage in a factual analysis of what type of disease James suffered from when it is undisputed that he suffered a catastrophic injury under the law.

¶ 41                          B. Emergency Prong

¶ 42    Next, we must determine whether James' cancer occurred as the result of his response to what is reasonably believed to be an emergency under section 10(b) of the Act. Here, the Board awarded James a line-of-duty disability pension, concluding that he had shown, by a preponderance of the evidence, that the cumulative effects of his acts of duty, either caused or more likely, were a contributing cause of his cancer. In reaching its decision, the Board found that James was exposed "to certain chemicals, fertilizer and radiation, which are known or

suspected carcinogens, during fire suppression, overhaul, fire inspection, hazmat responses and other duties." The Board further found that "the exposures occurred while [James] was performing duties undertaken during his career and while engaged in performing acts as an active fireman having the direct purpose of saving the life or property of another person when he was injured by these exposures." Likewise, the circuit concluded that the evidence showed "there were many emergencies that James responded to as a firefighter where he was exposed to [the] substances." The court thus held that plaintiffs satisfied section 10(b) of the Act.

¶ 43      Here, the District essentially argues that James cannot satisfy the emergency prong of section 10 because there was no evidence of a direct cause of his cancer. Stated differently, in order to recover benefits under the Act, James had to prove that his injury was received during an emergency response and that it was the sole cause of his cancer. This argument, however, ignores that "[a]n injury may have more than one proximate cause." (Internal quotation marks omitted.) *Richter v. Village of Oak Brook*, 2011 IL App (2d) 100114, ¶ 21. Under Illinois law, proximate cause is defined as a cause that, in the natural or ordinary course of events, produced the plaintiff's injury, but a cause need not be the only, last or nearest cause; rather, the combination of multiple causes may result in the injury. *Id.*

¶ 44      Moreover, as stated, the Board found that James was exposed to carcinogens when he was responding to emergencies and that those exposures were either the cause of or a contributing cause of his cancer. See *Gaffney v. Board of Trustees of Orland Fire Protection District*, 2012 IL 110012, ¶ 63 (noting that "section 10(b) covers situations arising in the performance of a public safety employee's job" and that "[t]he term 'emergency' in section 10(b), as applied to a firefighter, connotes the sense that either a person or property is in some form of imminent danger"). The Board's finding was supported by all three independent medical

evaluations of James, as well as by James' own testimony. Because the exposures at least contributed to James' cancer, plaintiffs can recover under the Act. See *Richter*, 2011 IL App (2d) 100114, ¶ 21 (holding the plaintiff could recover under the Act so long as the injury he sustained during an emergency response was a contributing cause of his disability, even if it was not the sole cause of that disability). In sum, we conclude that the circuit court properly granted summary judgment to plaintiffs because they satisfied both the catastrophic injury and emergency prongs of the Act and therefore were entitled to health insurance premium benefits from the District.

¶ 45                                    III. CONCLUSION

¶ 46    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 47    Affirmed.