2023 IL App (3d) 220365

Opinion filed July 14, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| ERIC L. THOMSEN, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-22-0365 |
| | ) | Circuit No. 22-MR-43 |
| THE VILLAGE OF BOLINGBROOK, | ) | |
| THE VILLAGE BOARD OF TRUSTEES OF | ) | |
| THE VILLAGE OF BOLINGBROOK, and | ) | |
| and MEGAN ROCHE STEIGAUF, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| (The Village of Bolingbrook and the Village | ) | Honorable |
| Board of Trustees of the Village of Bolingbrook,) | | John C. Anderson, |
| Defendants-Appellees). | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices McDade and Peterson concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        Plaintiff, Eric L. Thomsen, a firefighter/paramedic with the Village of Bolingbrook Fire

Department, was awarded a line-of-duty disability pension. He subsequently filed an application

with the Village of Bolingbrook, for the payment of his health insurance premiums, pursuant to

the Public Safety Employee Benefits Act (Act) (820 ILCS 320/1 *et seq.* (West 2020)). Following

an adjudication hearing, the hearing officer denied plaintiff's application. Plaintiff filed a complaint for a writ of *certiorari* in the circuit court against the Village of Bolingbrook and its board of trustees (defendants or, collectively, the Village) and moved for summary judgment on his claim.[1] After briefing and argument, the circuit court denied the motion and entered judgment for defendants. Plaintiff timely appealed. For the reasons set forth below, we affirm the circuit court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3        To place our discussion of the underlying proceedings in context, we first discuss the relevant portion of the Act and an overview of our supreme court's interpretation of the statute.

¶ 4                                         A. Act

¶ 5        The purpose of the Act, enacted in 1997, is to continue the provision of employer-sponsored health insurance coverage for public safety employees who are killed or "catastrophically injured" in the line of duty. *Id.* § 10(a); *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 16. Section 10 of the statute, titled "Required health coverage benefits," provides in relevant part:

> "(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority or until the end of the calendar year in which the child reaches the age of

---

[1]Plaintiff also named the hearing officer as a defendant and initially included an alternative claim for administrative review. However, the circuit court granted the parties' agreed motion to dismiss the hearing officer, as well as plaintiff's unopposed motion to dismiss the alternative count.

25 if the child continues to be dependent for support or the child is a full-time or part-time student and is dependent for support. ***

* * *

(b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act." 820 ILCS 320/10(a), (b) (West 2020).

¶ 6    The term "catastrophic injury" is not defined in the statute. However, our supreme court squarely addressed its meaning in *Krohe v. City of Bloomington*, 204 Ill. 2d 392 (2003). Noting that the term was facially ambiguous, the court resorted to the unambiguous legislative history supporting that "catastrophic injury" is "synonymous with an injury resulting in a line-of-duty disability under section 4-110 of the [Pension] Code." *Id.* at 397-400 (" 'I'd like to say for the sake of the record what we mean by catastrophically injured. What it means is that it is our intent to define 'catastrophically injured' as a police officer or firefighter who, due to injuries, has been forced to take a line of duty disability.' " (quoting 90th Ill. Gen. Assem., Senate Proceedings, November 14, 1997, at 136 (statements of Senator Donahue))); 90th Ill. Gen. Assem., House Proceedings, October 28, 1997, at 16 (statements of Representative Tenhouse) ("House Bill 1347 [p]rovides that employers of full-time law enforcement and firefighters who are killed or *disabled in the line of duty,* shall continue health benefits for the officer or fire fighter and the spouse and children, thereof." (Emphasis added.)).

¶ 7        The holding in *Krohe* "has never been disturbed." *International Ass'n of Fire Fighters, Local 50 v. City of Peoria*, 2022 IL 127040, ¶ 4. Indeed, the supreme court reaffirmed the holding in *Nowak* (*Nowak*, 2011 IL 111838, ¶ 12 (" 'catastrophic injury' is a term of art, and it means an injury that results in the awarding of a line-of-duty disability pension")), and in *Heelan* (*Village of Vernon Hills v. Heelan*, 2015 IL 118170, ¶ 27 ("This court decided *Krohe* in 2003 and *Nowak* in 20[11], but the legislature has not altered this court's construction of 'catastrophic injury' as used in section 10(a) of the Act. 'Our interpretation is considered part of the statute itself until the legislature amends it contrary to that interpretation. [Citation.]' ")).

¶ 8        Against this backdrop, we recount the relevant portions of the proceedings with respect to plaintiff's award of a line-of-duty disability pension and his subsequent application for benefits under the Act.

¶ 9                                    B. Pension Proceeding

¶ 10       Plaintiff began his employment with the Village's fire department in 2008. On January 14, 2019, he applied for a line-of-duty disability pension, pursuant to section 4-110 of the Illinois Pension Code (40 ILCS 5/4-110 (West 2018) (allowing a line-of-duty disability pension for "sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty")). Plaintiff's application stated as follows:

            "While at work as a firefighter for the Village of Bolingbrook on January 15, 2018, I slipped on some ice when stepping out of an ambulance on an emergency call, and twisted my back. I did not fall. I returned to the fire station and was attempting to start a chainsaw when I noted increasing pain in my low back area and pain in my left elbow. Since that time, I have had persistent pain in the low back area; pain in the elbow is intermittent."

4

¶ 11       A hearing on plaintiff's application proceeded before the Board of Trustees of the Village of Bolingbrook Firefighters' Pension Fund (Pension Board) on June 14, 2021, following which, the Pension Board granted plaintiff's application for a line-of-duty disability pension. In its written decision, approved on October 18, 2021, the Pension Board summarized the testimony and evidence presented, including the testimony of plaintiff and his colleague Jason Fuggiti (a Village of Bolingbrook Fire Department engineer) regarding plaintiff's injury and the independent medical examination findings.

¶ 12       In concluding that plaintiff established the requisite elements under section 4-110 of the Pension Code, the Pension Board found that (1) plaintiff was a firefighter, (2) he was "physically, permanently disabled for service in the Department as a result of the condition of his right shoulder," (3) plaintiff's "injury was incurred in or resulted from the performance of an act of duty or from the cumulative effects of acts of duty," and it was "clear from the record that his actions, both slipping on the ice while responding to an emergency call and, also, his starting of the chainsaw during routine maintenance were the causes of his permanent disability," and (4) plaintiff's "permanent disability renders it necessary to place him on a disability pension."

¶ 13       The Pension Board further found that plaintiff "did not have any pre-existing, documented, injuries to his back and/or hip prior to January 15, 2018" and was working full and unrestricted duties. The Pension Board noted that "[n]ot one of his treating doctors during his entire course of treatment cleared him for full and unrestricted duties" and that two of the three independent medical providers found plaintiff permanently disabled. Rejecting one of these two independent medical provider's opinion that plaintiff's subsequent hip surgery was unrelated to the January 15, 2018, injury, the Pension Board found that "the only logical reason in the record for the hip injury was the slip on the ice and the manual pulling of the chainsaw on January 15,

5

2018." The Pension Board also rejected the opinion of the third independent medical provider that plaintiff was not disabled.

¶ 14    In sum, the Pension Board concluded that, "[a]fter weighing all of the evidence and testimony in the record, observing the Applicant at Hearing, and considering the medical evidence which shows no significant pre-existing issues, it is clear that Applicant injured himself on January 15, 2018[,] and is still suffering the consequences of that." The Pension Board specified that plaintiff "injured his back and hip while slipping on the ice exiting the Ambulance, also, injured his back and hip and elbow while starting the chainsaw during the routine maintenance check." Accordingly, plaintiff's application was granted, and he was awarded a line-of-duty disability pension.

¶ 15                                   C. Act Proceeding

¶ 16    On September 22, 2021, plaintiff applied to the Village for the payment of his health insurance premiums pursuant to the Act. The Act application requests a description of when, where, and how the catastrophic injury occurred. Plaintiff responded:

> "While at work as a firefighter for the Village of Bolingbrook on January 15, 2018, I slipped on some ice when stepping out of an ambulance on an emergency and twisted my back. I returned to the fire station and was attempting to start a chainsaw when I noticed increasing pain in my low back area and pain in my left elbow. Since that time, I have had persistent pain in the low back area; pain in the elbow is Intermittent."

Plaintiff further specified in his application that the catastrophic injury occurred as a result of his response to what was reasonably believed to be an emergency.

¶ 17    An adjudication hearing on plaintiff's Act application proceeded before a hearing officer on December 9, 2021. At the inception of the hearing, the Village stipulated that the line-of-duty

6

disability pension established a "catastrophic injury" for purposes of section 10(a) and that the only issue was whether plaintiff satisfied section 10(b)'s requirement that the injury occurred as the result of his response to what is reasonably believed to be an emergency.

¶ 18    We summarize the relevant evidence from the adjudication hearing. Plaintiff testified that, on the morning of January 15, 2018, he was dispatched to an accident with injuries on Interstate 55 and drove his assigned ambulance with lights and sirens to the scene. Plaintiff's battalion chief, the Illinois State Police, and a Romeoville Fire Department fire truck were already at the scene when he arrived. He pulled up behind the vehicle involved in the accident and in front the police car and set up "blocking" to help secure the scene by parking at an angle and "crowd[ing] the middle lanes." Plaintiff explained that, when he exited the ambulance in his bunker pants and boots, he slipped on what he believed to be ice and felt a sharp pain in his back that "kind of stopped me in my tracks." Plaintiff "did a big wince, kind of stabilized myself, took a couple deep breaths and then started to just move on, and then drove out—trying to secure the scene and do my job." Plaintiff proceeded to render care to the occupants of the vehicle involved in the accident.

¶ 19    Plaintiff testified that he had conversations with two people at the scene about the incident. First, when plaintiff's colleague Fuggiti arrived at the scene, plaintiff told him that he had slipped when exiting the ambulance. Second, as he and his partner, Tara Moser, were returning to the ambulance, he told Moser that his back was "killing" him. Fuggiti testified that, when he arrived at the scene, he saw plaintiff "stretching his back" and "kind of moving left to right and leaning back." Fuggiti asked plaintiff if he was okay, and plaintiff responded that he "slipped getting out of the ambulance because there was snow on the ground."

¶ 20     Plaintiff acknowledged that he did not immediately tell anyone at the station about the incident when he returned there after the dispatch call. Upon returning to the station, plaintiff and Moser began their weekly checks on the ambulance and its engine. They were asked to check the saws. Plaintiff testified that his back was increasingly hurting at that point. Plaintiff repeatedly pulled the chainsaw he was checking, but it would not start. Moser was likewise having difficulty with starting a circular saw, so plaintiff assisted her in starting it, and then returned to his saw. After a couple more "rounds of trying," right before the final pull, the saw "kicked back," and plaintiff "felt like a burning in my left elbow." Plaintiff continued to pull, got it started, and finished the check on the saws.

¶ 21     Plaintiff further testified that, after putting away the saws, his lieutenant requested assistance in checking the heavy extrication tools on the back of the engine. Plaintiff "went to go grab the spreaders, the large extrication tool spreader, and reached out over the back of the engine, grabbed a hold of it and pulled and that's when I winced, then my back locked up on me ***." Plaintiff proceeded to conduct the standard checks on the tool spreader "and then continued on." Plaintiff testified that, later that afternoon, he told his lieutenant that he slipped exiting the ambulance on I-55 and that "it was further aggravated" during the checks. According to plaintiff, later in the evening, his lieutenant stated that "he noticed me wince, but said nothing."

¶ 22     Fuggiti testified that, later in the evening, at the firehouse, he noticed that plaintiff was in some distress from his back pain. Fuggiti looked at plaintiff's back and described it as swollen. He made plaintiff an ice pack.

¶ 23     The evidence established that, before the end of his shift, plaintiff completed a "National Fire Incident Reporting System Report" (NFIRS Report), regarding the dispatch to I-55. An

NFIRS Report is done for every dispatch call. In the report, plaintiff detailed the dispatch, described the vehicles at the scene, and noted "NO INJURIES. POLICE MATTER ONLY."

¶ 24   The "FIREHOUSE log" for plaintiff's shift included a note from the lieutenant, stating:

"Shortly after completing the weekly check on Engine 5, Eric Thomsen advised me that he had some back pain. Eric did not request any medical attention but did want me to be aware of his situation. At the end of the shift Eric informed me that his back was still stiff. I asked Eric to keep me informed of his situation."

According to plaintiff, the lieutenant entered the report "after sleeping on it and not fully recalling what [plaintiff] had told him the evening before."

¶ 25   A three-page January 23, 2018, incident report, titled "Illinois Form 45: Employer's First Report of Injury," was completed by the deputy fire chief. The first page of the report reflects the following questions and answers: (1) "What was the employee doing when the accident occurred? Repeatedly attempting to pull start a chain saw from Engine 5," (2) "How did the accident occur? Pulling start chain on chain saw and moving saw from compartment to floor," (3) "What was the injury or illness? List the part of body affected and explain how it was affected. Mid and Lower Back," and (4) "What object or substance, if any, directly harmed the employee? Pulling motion of start chain."

¶ 26   The second page of the report is the January 22, 2018, "Supervisor's Investigation Report," completed by the battalion chief. The response provided in the section labeled "Object/Equipment/Substance/Inflicting" was "Starting chain saw/moving hydraulic tools." In the section requesting a description of how the incident occurred, the response was:

"While doing the weekly engine tool checks on engine 5, FF/PM Thomsen while repeatedly attempting to pull start a chain saw from engine 5 noticed some discomfort in

9

[h]is back. When Eric preceded to remove hydraulic tools from the vehicle['s] compartment to floor is when Eric notice[d] sharp pain in his mid and lower back area."

¶ 27 The response to the question of "[w]hat acts, failures to act and/or conditions contributed most directly to THIS ACCIDENT" was "Failure of chain saw not starting on multiple attempts." And finally, in the section requesting "the basic or fundamental reasons for the existence of these acts and/or conditions," the response provided was: "When starting a chain saw one must use a manual rope starter to initiate operation of saw. Pull starting a chain saw while under compression can lock up the starting rope jarring employee's arm and back."

¶ 28 The third and final page of the report, titled "Human Resources Report," stated, in a section for additional notes: "At the time of incident (1/15/2018) Eric Thomsen did not request medical services offered to him. In the morning at the end of shift Eric still had some discomfort to his back and again did not request medical treatment. Lt. Newton did log this in his daily station log." Plaintiff acknowledged that his slip on the ice was not included in the foregoing reports but indicated that the responses were not complete or that some of his response had been deleted during entry. Plaintiff elaborated that he told his battalion chief that he slipped getting out of the ambulance, that he felt a pain, and that the injury was further aggravated throughout the day while doing the weekly checks. His battalion chief told him that he "should stick with the chain saw," and plaintiff responded that he was not going to argue with him because he was late for a doctor's appointment.

¶ 29 Plaintiff's medical records included 26 records from Premier Occupational Health titled "Patient Visit Summary and Instructions." The dates of the records spanned from January 22, 2018, to April 15, 2019, and included a section for "Patient's Description of Problem." On each record, which plaintiff signed, the description stated, "While at work, I was doing weekly tool

10

check and I repeatedly tried to start a chainsaw when I felt lower back pain shortly after." Plaintiff testified that this section was "just a copy and paste" from record to record and suggested that the appointment notes reflected additional information about his injuries.

¶ 30       Following the adjudication hearing, on January 14, 2022, the hearing officer denied plaintiff's Act application. In her written order, the hearing officer identified the issues to be decided as follows: "Was the injury which Applicant received his line-of-duty disability pension from a slip at an accident on I-55 or was the injury from repeatedly attempting to start a chainsaw and hydraulic tools in Applicant's normal course of employment in January 15, 2018."

¶ 31       After a recitation of the evidence presented at the hearing, the hearing officer acknowledged, as a preliminary matter, that "[i]t need not be determined whether the Applicant's injury was catastrophic." Rather, the supreme court's decision in *Heelan*, 2015 IL 118170, "made it 'irrefutable' that if an employee wins a line-of-duty disability pension, then he/she suffered a catastrophic injury as a matter of law."

¶ 32       However, the hearing officer noted that this did not mean that every firefighter who received a line-of-duty disability pension is automatically entitled to benefits under the Act, as this would render the requirements in section 10(b) "superfluous and meaningless." While the Village was not disputing that plaintiff's injury was catastrophic under section 10(a), the Village was

> "disputing that the injury alleged which Applicant received line-of-duty pension was from slipping at the accident on I-55—which would have been in response to what is reasonably believed to be an emergency—or whether the injury was a result from repeatedly attempting to start a chain saw and hydraulic tools—which occurred afterward in Applicant's normal course of employment."

11

¶ 33    The hearing officer found that "the accident on I-55 on January 15, 2018, was an emergency." However, the hearing officer proceeded to "turn to whether the injuries sustained by the Applicant were a result of slipping on ice while exiting the ambulance at the scene of the accident on I-55 or whether they were from repeatedly attempting to pull-start chainsaws and tool checks during his shift on January 15, 2018."

¶ 34    In answering this question, the hearing officer reasoned that there was minimal testimony regarding how plaintiff injured his back from slipping on the ice. Namely, the hearing officer queried: "How did he exit the ambulance? Which foot slipped? Did he fall to the ground? Did he catch himself mid-fall? Was he injured from twisting? Did his back hit anything? Did any part of his body hit anything? No one saw the slip or fall." Moreover, the hearing officer reasoned, after slipping, plaintiff performed his duties at the scene by rendering care to the occupants of the vehicle involved in the crash. The hearing officer further reasoned that, while Fuggiti testified that he noticed plaintiff stretching at the scene, and plaintiff told him that he slipped getting out of the ambulance, plaintiff "did not tell him his back was killing him or that he was injured." And while plaintiff testified that he told Moser that his back was killing him, Moser did not testify. Thus, the hearing officer concluded, "[b]esides his own testimony, there is no evidence that [plaintiff] told any supervisor that he slipped on ice or snow and injured himself."

¶ 35    Plaintiff did not report the injury upon his return to the station and proceeded to perform his duties by conducting the equipment checks. The hearing officer queried: "If his back was killing him, why did he not tell his lieutenant when the lieutenant asked him to check the saws that he was injured as a result of slipping on ice during the morning call." And when asked to check the heavy extrication tools, plaintiff likewise again did not notify his lieutenant of his injury. While Fuggiti testified that plaintiff's back was swollen that evening, it could have been

swollen as result of repeatedly trying to start the chainsaws and checking the heavy extrication tools.

¶ 36　　　　Turning to the incident reports, the hearing officer noted that "[n]one of these documents mention Applicant's injury as a result of a slip on I-55 at the scene of an accident." With respect to the medical records, the hearing officer acknowledged that the description of the problem is copied and pasted on all subsequent records but pointed out that plaintiff had "every opportunity to give a differen[t] description of how his injury occurred, without pressure from any superior, and/or reference the slip on I-55 previously on the day. However, there is none."

¶ 37　　　　In sum, the hearing officer found that plaintiff did not prove, by a preponderance of the evidence, that his injuries occurred during an emergency accident on January 15, 2018. Rather, the evidence established that plaintiff's injuries were the result of "repeatedly attempting to pull-start chainsaws and tool checks" during his January 15, 2018, shift. Accordingly, the hearing officer declined to award benefits under the Act on the basis that plaintiff failed to satisfy section 10(b).

¶ 38　　　　　　　　　　　　　　　D. Circuit Court Proceedings

¶ 39　　　　On February 15, 2022, plaintiff filed the complaint for a writ of *certiorari* against defendants, seeking a judgment that he is entitled to benefits under the Act and an order that defendants pay all health insurance premiums on his behalf in accordance with the statute. Plaintiff subsequently moved for summary judgment on his claim. Following briefing and argument, the circuit court denied the motion and entered judgment for defendants. The circuit

court's order stated that it found "a sufficient basis in the record to support the hearing officer's decision."[2] Plaintiff timely appealed.

¶ 40                                    II. ANALYSIS

¶ 41        In determining whether plaintiff is entitled to payment of his health insurance premiums under the Act, we note initially that the parties agree that plaintiff was awarded a line-of-duty disability pension and thus suffered a catastrophic injury as a matter of law under section 10(a) of the statute. *Id.* ¶ 28. The determinative question is whether plaintiff established that this injury occurred as the result of his response to what is reasonably believed to be an emergency under section 10(b).

¶ 42                               A. Standard of Review

¶ 43        Initially, the parties dispute the standard of review. Plaintiff contends that we should apply a *de novo* standard of review. The Village counters that the proper standard of review is whether the hearing officer's decision was against the manifest weight of the evidence.

¶ 44        Plaintiff appeals from the circuit court's order denying plaintiff's summary judgment motion and granting judgment for the defendants on plaintiff's complaint for a writ of *certiorari*. The standards of review under a common law writ of *certiorari* are essentially the same as the standards under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2008)). *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 48. We review the final decision of the administrative agency, not the decision of the circuit court. *Id.* The applicable standard of review depends upon whether the question presented is one of law (subject to *de novo* review), fact (subject to the manifest-weight-of-the-evidence standard of review), or a

_____

[2]The circuit court's order further stated that "[j]udgment is entered for defendants on Counts I & II." However, as noted, Count II (the alternative claim for administrative review) already had been dismissed.

mixed question of fact and law (subject to the clearly-erroneous standard of review). *Id.* (citing *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008)).

¶ 45    This case does not involve a question of law like the issue of statutory construction presented in *Heelan*—the meaning of "catastrophic injury" as used in section 10(a) of the Act. *Heelan*, 2015 IL 118170, ¶ 18. Nor does this case involve a mixed question of law and fact like the question presented in *Pedersen*—whether the circumstances of the plaintiff's injury qualified as a response to an "emergency" under section 10(b) of the Act, as defined by our supreme court. *Pedersen*, 2014 IL App (1st) 123402, ¶¶ 51-52 (citing *Gaffney v. Board of Trustees of the Orland Park Fire Protection District*, 2012 IL 110012, ¶ 64 ("[T]he plain and ordinary meaning of the term 'emergency' in section 10(b) is an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response.")). Here, the question is not whether the circumstances of plaintiff's injury satisfied the definition of "emergency." Indeed, the emergency nature of the dispatch to the accident on I-55 and the nonemergency nature of the routine maintenance at the station were undisputed.

¶ 46    Rather, the question presented here is simply whether the evidence of record supported the hearing officer's determination as to whether plaintiff's injury "occurred as the result of" his response to an emergency under section 10(b). This is a question of fact subject to the manifest-weight-of-the-evidence standard of review. See *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504-05 (2007) (applying manifest-weight-of-the-evidence standard in reviewing whether the evidence supported a pension board's ruling on line-of-duty disability pension application); see also *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶¶ 22-23 (applying manifest-weight-of-the-evidence standard in reviewing the underlying factual issue of whether the plaintiff was entitled to benefits under section 10 of the Act). A decision is against

the manifest weight of the evidence only when the findings appear to be unreasonable, arbitrary, or not based on evidence or when an opposite conclusion is apparent. *Vaughn*, 2016 IL 119181, ¶ 23.

¶ 47     With these concepts in mind, we turn to the parties' arguments.

¶ 48                                         B. Section 10(b)

¶ 49     Plaintiff's central argument is that the hearing officer exceeded the scope of her authority under section 10(b) of the Act by revisiting the cause of plaintiff's injury. According to plaintiff, the hearing officer's role was limited to "tak[ing] the injury(s) that was determined to be catastrophic by the Pension Fund and determine[ing] if that injury occurred during firefighter's response to what is reasonably believed to be an emergency." In support, plaintiff quotes at length from our supreme court's decision in *Heelan*. A careful examination of the decision in *Heelan* reflects that the decision does not support plaintiff's position.

¶ 50     In *Heelan*, the village police officer slipped on ice and injured his right hip while responding to an emergency call. *Heelan*, 2015 IL 118170, ¶¶ 4-5. The injury aggravated the officer's preexisting right hip osteoarthritis, treatment aggravated the same preexisting condition in the left hip, and, ultimately, the officer had both hips replaced and was unable to return to work. *Id.* ¶ 5. The pension board awarded the officer a line-of-duty disability pension. *Id.* ¶ 7. The village subsequently sought a declaratory judgment that it was not required to pay the officer's health insurance premiums under the Act, disputing that the officer suffered a catastrophic injury under section 10(a) but conceding that section 10(b) was satisfied. *Id.* ¶¶ 9, 11. The circuit court entered judgment for plaintiff, finding that he was entitled to benefits under the Act. *Id.* ¶ 12. A divided panel of the appellate court affirmed. *Id.* ¶ 13 (citing *Village of Vernon Hills v. Heelan*, 2014 IL App (2d) 130823).

16

¶ 51     In affirming the appellate court's decision, the supreme court reiterated its holdings in *Nowak* and *Krohe* that an award of a line-of-duty disability pension established a catastrophic injury under section 10(a). *Id.* ¶ 27. Specifically, the supreme court concluded that,

> "[b]ecause the legislature intended an injured public safety employee to be eligible for benefits under section 10(a) of the Act whenever his or her injuries were sufficient to qualify for a line-of-duty disability pension, the pension board's award establishes *as a matter of law* that the public safety employee suffered a catastrophic injury." (Emphasis in original.) *Id.* ¶ 25.

Thus, " 'where it is uncontroverted that a line-of-duty disability pension has been awarded, section 10(a) is satisfied, and there is no need to engage in discovery or present evidence regarding the claimant's injury.' " *Id.* (quoting *Heelan*, 2014 IL App (2d) 130823, ¶ 26).

¶ 52     Rejecting the village's argument that it was being collaterally estopped from litigating the issue of whether the officer had suffered a catastrophic injury under section 10(a), the supreme court explained that its analysis "does not involve collateral estoppel, but rather statutory construction." *Id.* ¶ 28. That is, the plaintiff's "award of a line-of-duty disability pension establishe[d] that he suffered a catastrophic injury *as a matter of law*." (Emphasis in original.) *Id.* The supreme court also rejected the village's procedural due process argument, concluding that there were no factual disputes left to litigate in the case, given its construction of section 10(a) and the village's concession that section 10(b) was satisfied. *Id.* ¶ 33.

¶ 53     On its face, the holding in *Heelan* is not dispositive here. Given the village's concession that section 10(b) had been satisfied there, the only issue in *Heelan* was whether plaintiff suffered a catastrophic injury under section 10(a). Conversely, here, the Village conceded that

17

section 10(a) was satisfied but contested the additional requirement under section 10(b) of whether the injury occurred as the result of plaintiff's response to an emergency.

¶ 54    Moreover, under the rationale set forth in *Heelan*, the line-of-duty-disability pension that plaintiff was awarded in this case merely established that plaintiff suffered a catastrophic injury under section 10(a), not how the injury occurred. The question under section 10(a) is whether plaintiff suffered a catastrophic injury, whereas the question under section 10(b) involves a causation analysis—whether the injury occurred as the result of plaintiff's response to an emergency. Here, the hearing officer explicitly recognized that section 10(a) was satisfied and proceeded to consider the additional requirement under section 10(b) of how the injury occurred.

¶ 55    We note initially that the Pension Board's finding that plaintiff was injured from slipping on the ice while responding to an emergency and from starting the chainsaw during routine maintenance did not collaterally estop the Village from contesting in the Act proceeding whether plaintiff suffered an injury while responding to an emergency. Application of collateral estoppel requires, *inter alia*, that the issue decided in the prior adjudication be identical to the issue presented in the suit in question. *Oskroba v. Village of Hoffman Estates*, 404 Ill. App. 3d 692, 696 (2010), *abrogated on other grounds by Gaffney*, 2012 IL 110012, ¶¶ 59, 64. The issue decided by the Pension Board (whether plaintiff was injured in the performance of an act of duty pursuant to section 4-110 of the Pension Code) is not the same issue decided by the hearing officer (whether the injury occurred as the result of plaintiff's response to what is reasonably believed to be an emergency pursuant to section 10(b) of the Act). See *Oskroba*, 404 Ill. App. 3d at 696-97 (rejecting the plaintiff's argument that the pension board's determination that he was responding to an emergency when injured collaterally estopped the village from denying benefits under the Act).

18

¶ 56    Plaintiff asserts that he does not advocate application of collateral estoppel. Rather, his position is that "section 10(a) was satisfied by the Pension Board's award as a matter of law due to statutory construction as determined by the Supreme Court." This argument misses the point. The question here was *not* whether section 10(a) was satisfied. The hearing officer explicitly acknowledged that section 10(a) was satisfied. Plaintiff was awarded a line-of-duty disability pension and thus suffered a catastrophic injury as a matter of law. 820 ILCS 320/10(a) (West 2020); *Heelan*, 2015 IL 118170, ¶ 28. The question for the hearing officer was whether plaintiff's injury occurred as the result of his response to an emergency under section 10(b).

¶ 57    Plaintiff, however, maintains that the hearing officer essentially revisited whether the catastrophic injury occurred in finding that plaintiff's injury resulted from attempting to start the chainsaws and checking the heavy tools, and not from slipping on the ice during the emergency call. A review of the hearing officer's decision reflects otherwise. The hearing officer did not revisit whether a catastrophic injury occurred. Rather, as discussed, the hearing officer's analysis revolved around how that injury occurred—a wholly appropriate consideration under section 10(b).

¶ 58    The distinction between section 10(a) and section 10(b) was discussed in *Cronin v. Village of Skokie*, 2019 IL App (1st) 181163, ¶ 35-37. The firefighter in *Cronin* was awarded a line-of-duty disability pension and thereafter sought benefits from the village under the Act. *Id.* ¶¶ 3-8. In affirming the circuit court's grant of summary judgment in the firefighter's favor, the appellate court rejected the village's argument that the firefighter's injury occurred as the result of his preexisting ascending aortic aneurysm (and not as the result of his response to a cardiac arrest call). *Id.* ¶¶ 33-34, 40. Recognizing that receipt of a line-of-duty disability pension does not automatically entitle the public safety employee to benefits under the Act, the appellate court

explained that "there may be factual issues regarding causation where the fact finder is looking for the connection between the employee's injury and one of the four specific scenarios listed in section 10(b)." *Id.* ¶ 37. In such cases, the proper focus is on "whether a causal connection satisfying the phrase 'occurred as the result of' has been shown." *Id.*

¶ 59 Ultimately, the appellate court in *Cronin* concluded there were no 10(b) factual issues presented there. *Id.* ¶¶ 37-40. In addition to the uncontested emergency nature of the cardiac-arrest call, "there was evidence of only one work-related injury," and the village offered "absolutely no evidence that any other work-related incident could be the basis" for the firefighter's line-of-duty disability pension. *Id.* ¶¶ 38-39. This case, however, presents the very situation contemplated and distinguished by *Cronin*, where there *is* evidence of more than one work-related incident, thereby requiring an inquiry into the connection between the injury and whether the injury occurred as the result of plaintiff's response to an emergency under section 10(b). Accordingly, the hearing officer properly considered whether there was a causal connection between plaintiff's injury and the work-related incidents.

¶ 60 Having addressed plaintiff's argument regarding the scope of the hearing officer's authority, we turn to whether the evidence of record supported the hearing officer's determination that plaintiff failed to meet his burden of proving that his injury occurred as the result of his response to an emergency, as required by section 10(b). The hearing officer found that the evidence established that plaintiff's injury was the result of pull-starting the chainsaws and checking tools, and not the result of slipping on the ice while exiting the ambulance on I-55. Having reviewed the record, we cannot say that this finding was unreasonable, arbitrary, or not based on evidence or that the opposite conclusion is apparent.

20

¶ 61        As noted by the hearing officer, there were no eyewitnesses to the slip on I-55 and no corroborating evidence that plaintiff told a supervisor about the slip on the ice. We acknowledge plaintiff's testimony that his injury began after slipping on the ice during the emergency call and that he reported the incident. However, the hearing officer discounted this testimony, noting that there was minimal evidence regarding how plaintiff injured his back from slipping on the ice, including, as the hearing officer queried: "How did he exit the ambulance? Which foot slipped? Did he fall to the ground? Did he catch himself mid-fall? Was he injured from twisting? Did his back hit anything? Did any part of his body hit anything?" Also, plaintiff admittedly did not initially tell anyone about the slip when he returned to the fire station and proceeded to pull-start chainsaws and check heavy equipment without mentioning the injury from slipping on the ice.

¶ 62        Moreover, none of the incident reports mention an injury from slipping on the ice on I-55. Rather, the reports merely recount injury from pull-starting the chainsaws and moving tools. Likewise, plaintiff's medical records from Premier Occupational Health, with dates beginning the week after the alleged date of injury, reflect that plaintiff reported only the chainsaw incident as the description of his problem. Accordingly, applying the manifest weight of the evidence standard of review, we cannot say it was unreasonable for the hearing officer to conclude that plaintiff failed to establish that his injury occurred as the result of slipping on the ice.

¶ 63        Plaintiff suggests that the hearing officer failed to appreciate that an injury may have more than one proximate cause and that plaintiff was thus not required to prove that the injury he sustained while slipping on the ice on I-55 was the sole cause of his disability. See *Richter v. Village of Oak Brook*, 2011 IL App (2d) 100114, ¶ 21 (holding that the plaintiff could recover under the Act provided the injury he sustained during an emergency response was a contributing cause of his disability, even if it was not the sole cause of that disability); accord *Ivetic v.*

21

*Bensenville Fire Protection District No. 2*, 2023 IL App (1st) 220879, ¶ 41-43. However, a review of the hearing officer's decision reflects otherwise. While the hearing officer's initial framing of the issue suggested the need to choose only one incident as the cause of the injury, the entirety of the decision demonstrates that the hearing officer carefully reviewed the evidence and simply found *insufficient* evidence that plaintiff's injury occurred as the result of slipping on the ice. For the reasons discussed, we cannot say that this finding was unreasonable, arbitrary, or not based on evidence or that the opposite conclusion is apparent.

¶ 64        In sum, the hearing officer's denial of plaintiff's application for benefits under the Act was not against the manifest weight of the evidence.

¶ 65                                III. CONCLUSION

¶ 66        We affirm the judgment of the circuit court of Will County, which upheld the hearing officer's decision.

¶ 67        Affirmed.

*Thomsen v. Village of Bolingbrook*, 2023 IL App (3d) 220365

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 22-MR-43; the Hon. John C. Anderson, Judge, presiding. |
| **Attorneys for Appellant:** | Scott P. Moran, of Law Offices of Thomas W. Duda, of Palatine, for appellant. |
| **Attorneys for Appellee:** | Cary A. Horvath and Amy E. Zale, of Odelson, Sterk, Murphey, Frazier & McGrath, Ltd., of Evergreen Park, for appellees. |